**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL A. HODKINSON, | ) | Case No. 5:24-CV-00614-PAG |
| | ) | |
| Petitioner, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| WARDEN, MISTY MACKEY | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | **REPORT & RECOMMENDATION** |

## I.  INTRODUCTION

Petitioner, Michael A. Hodkinson ("Mr. Hodkinson"), seeks a writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 1). Mr. Hodkinson was sentenced to life without the possibility of parole after being convicted of eight counts of rape and eight counts of gross sexual imposition.

Mr. Hodkinson asserts a single ground for relief. Respondent, Warden Misty Mackey ("Warden"), filed an answer/return of writ on October 15, 2024. (ECF No. 12). Mr. Hodkinson filed a traverse on December 16, 2024. (ECF No. 14). This matter was referred to me on July 16, 2024, under Local Rule 72.2 to prepare a report and recommendation on Mr. Hodkinson's petition. (*See* ECF non-document entry dated July 16, 2024). For the reasons set forth below, I recommend that Mr. Hodkinson's petition be DENIED. I further recommend that the Court not grant Mr. Hodkinson a certificate of appealability.

## II.  RELEVANT FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, a state court's findings of fact are presumed correct and can be contravened only if the habeas petitioner shows, by

1

clear and convincing evidence, that the state court's factual findings are erroneous. 28 U.S.C.

§ 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d

524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by

a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. The Ohio

Court of Appeals for the Fifth Appellate District summarized the facts as follows:

{¶4} The following evidence was adduced at trial.

{¶5} Detective Jeff Moore of the Tuscarawas County Sheriff's Office testified he observed the forensic interview of the Victim, which was conducted at a child advocacy center on June 4, 2021. Based upon information the Victim relayed during her interview, Detective Moore proceeded to the Hampton Inn in New Philadelphia, Ohio. Hotel records confirmed Appellant had rented a room, which was registered to his address, on August 21, at 4:28 p.m. In order to rent the room, Appellant was required to provide a photo ID and a credit card. During the forensic interview, the Victim disclosed Appellant had driven her to the hotel in a silver convertible. Detective Moore was able to verify Appellant owned a silver Pontiac convertible.

{¶6} On June 30, 2021, Detective Moore conducted an interview of Appellant at the Tuscarawas County Sheriff's Office. A video recording of the interview was played for the jury. Based upon Detective Moore's investigation, Appellant was placed under arrest.

{¶7} Detective Moore monitored Appellant's phone calls while he was being held in jail. The jailhouse calls were video recorded. During a phone call with his daughter, Ashley Hodkinson, on July 8, 2021, Appellant placed a note in front of the video camera. The note read: "Tell your mom it's okay. That you know when we met at the Hampton Inn two years ago beside Arby's." Trial Transcript at 115. Thereafter, Appellant covered the video camera with his hand. Detective Moore explained Appellant was trying to let Ashley know the call was being recorded and she needed to be careful about what she said. During a second call, Appellant told Ashley he was at the Hampton Inn with her mother, his ex-wife, Denise Hodkinson, and they were engaged in a sexual relationship. Detective Moore spoke with Denise Hodkinson, who indicated she and Appellant had not been together in 21 years.

{¶8} Skyler Smolak, a caseworker and forensic interviewer with Tuscarawas County Job and Family Services ("TCJFS"), testified he was assigned to the case in June, 2021, after TCJFS received an anonymous report of suspected abuse involving the Victim. The intake sheet reflected the referral was made to TCJFS by an unrelated female. After he was unable to reach Trisha Jones aka Trisha McGill, the Victim's mother, by phone, Smolak proceeded to the address on the intake sheet to initiate his investigation. Appellant answered the door and told Smolak Jones was at work at WalMart and had taken the Victim with her that day. Smolak advised Appellant

2

TCJFS had received allegations of sexual abuse involving him and explained either he or Jones and the Victim would have to leave the residence.

{¶9} Smolak spoke with Jones a few days later, informed her of the allegations against Appellant, and scheduled a forensic interview of the Victim. Judy Couts, the Victim's grandmother, brought the Victim to the child advocacy center for the forensic interview on June 8, 2021.

{¶10} The Victim was well-dressed and her hair was groomed. She was calm and made good eye contact with Smolak. When discussing things she liked, the Victim was happy and animated. Smolak described her demeanor as "overall joy, joyous." Tr. at 138. Smolak recalled the Victim's demeanor immediately changed when she began to explain why she was there that day. The Victim started to cry, "seemed very upset, nervous to talk about what she was going to tell me." *Id.* at 139. The Victim disclosed an incident at a hotel. Following the interview, Smolak advised the grandmother the Victim should not have any contact with Appellant. Smolak referred the Victim to counseling and for a medical examination.

{¶11} On cross-examination, Smolak testified the Victim indicated the abuse started when she was six years old. The Victim was 12 or 13 years old at the time of the interview. The Victim told Smolak the last incident of abuse occurred in February, 2021. On re-direct examination, Smolak stated the Victim used age appropriate language. He added she had knowledge of sexual experiences which was not typical for a child of her age.

{¶12} M.M., the Victim's older brother, testified Appellant gave the Victim basically "anything she wanted for the most part," including a horse. Tr., Vol. II at 160. M.M. thought it was unusual as Appellant did not give his daughter anything she wanted. M.M., who was 20 years old at the time of trial, recalled he was 15 years old when the Victim disclosed Appellant's abuse. M.M. did not report the disclosure because he did not think the Victim was serious. When M.M. learned the Victim was making disclosures to her friends, he approached her again. M.M. "didn't want to tell anybody because [he] was afraid that [he] was going to put [his] mom and [the Victim] in a bad situation," specifically, losing a place to live. *Id.* at 164. M.M. tried to be around the house to make sure the Victim was safe.

{¶13} Sometime in late 2020, M.M. received Snapchat photos from the Victim, showing her crying. M.M. spoke with the Victim then told Jones Appellant was forcing the Victim to have sex with him. M.M. described Jones as "furious." On cross-examination, M.M. acknowledged Jones and the Victim continued to live with Appellant after the disclosure.

{¶14} Trisha Jones testified she and her children moved into Appellant's home around May, 2010. Appellant's daughter, Daphne, was also living in the home on opposite weeks through the shared parenting plan between Appellant and Brenda Hall, her mother. Initially, Jones' relationship with Appellant went well. However, Appellant and Jones' three sons were not getting along and Jones and her four children moved

in with her mother. A year later, Jones and the children returned to Appellant's home. Jones described the relationship between Appellant and the Victim as close, recalling the Victim called him "dad."

{¶15} Jones stated she had foot surgery in late July, 2020, and was on leave from work for 12 weeks. One day when she was home, Appellant took the Victim to pick up food. Jones recalled Appellant and the Victim were gone for over an hour and when they returned, the food was cold. Jones was unaware of Appellant's abuse of the Victim until M.M. told her. When Jones asked the Victim about the allegations, the Victim "just blurted out balling, which made me cry." *Id*. at 196.

{¶16} Jones indicated she stayed with Appellant because she could not afford a place of her own. Jones never confronted Appellant. In order to keep the Victim safe until she could find a different place to live, Jones would take the Victim to work with her or make alternative arrangements. Jones and the Victim left Appellant's home after she was instructed to do so by TCJFS. Jones was also instructed to arrange an interview for the Victim at the child advocacy center.

{¶17} On cross-examination, Jones stated she and her children moved out of Appellant's home three times during the course of her relationship with Appellant. She and her children moved out in 2012, but moved back in with Appellant in 2013. Jones and her children moved out again in 2016. Jones, M.M. and the Victim returned to Appellant's home in 2017. Appellant kicked M.M. out of the house in April, 2021. Jones and the Victim left for the last time following TCJFS involvement.

{¶18} Karie Milburn, an employee at the Hampton Inn in New Philadelphia, identified State's Exhibit 1 as the check-out folio from a reservation at the hotel. Milburn stated the Hampton Inn requires an individual to present an ID and a credit card in order to rent a room. The name on State's Exhibit 1 was that of Appellant. The check-in date was August 21, 2020, and the departure date was August 22, 2020.

{¶19} The Victim testified Appellant and Jones started dating when she was approximately two years old. The Victim explained her father was not involved in her life and Appellant was the only father figure she had. She stated, "He made me feel like a daughter because at the time I didn't have a dad, so he was like a father figure, took care of me. Bought me gifts for birthdays and Christmas. * * * He treated me how he would treat his other daughters. * * * He would take me riding on is [sic] four wheeler. He got me animals." *Id*. at 212. The Victim added Appellant actually treated her better than his daughter, Daphne, who lived in the home, and if she asked for something, Appellant usually said yes. Appellant rarely told her "No."

{¶20} The Victim recalled Appellant started abusing her when she was six or seven years old, touching her breasts and her vagina. The Victim added, "He would touch me where I should never be touched." *Id*. at 220. She explained, "I thought it was what fathers and daughters did." *Id*. at 221. She recounted Appellant removing her clothing, laying her on the bed, and touching her breasts and vagina. Appellant would remove his pants and underwear and touch her vagina with his penis. The Victim explained

4

Appellant would keep his penis in her vagina "[u]ntil he was ready * * * [t]o spray liquid on me." *Id*. at 225. The Victim described the liquid as white with a "[d]isgusting odor." *Id*. Appellant would sometimes place his finger in her vagina. Appellant's abuse continued until the Victim was 13 years old. Appellant told the Victim not to tell anyone because, according to Appellant, "they wouldn't understand." *Id*. at 229. The Victim felt like she could not tell anyone what Appellant was doing to her.

{¶21} The last incident of abuse occurred in February, 2021. The Victim attempted to get away from Appellant, but Appellant grabbed her and pushed her into the bedroom. After the incident, the Victim sent a Snapchat photo of herself crying to M.M. M.M. immediately contacted the Victim and she disclosed the abuse. M.M. told Jones.

{¶22} The Victim detailed an incident which occurred when her friend, N.W., was visiting. The Victim and N.W. were in the Victim's bedroom with the door closed. Appellant walked in and remarked N.W. was pretty and he wanted to touch her. N.W. refused Appellant's advances. Appellant then began to grope the Victim. When asked how she was feeling at the time, the Victim stated, "Normal at the time." *Id*. at 233. N.W. observed what happened and encouraged the Victim to tell someone. The Victim was unable to disclose Appellant's abuse to anyone because she "just didn't have a voice." *Id*. N.W. helped the Victim recognize Appellant's behavior was not normal and was not appropriate. However, the Victim asked N.W. not to tell anyone because she was scared.

{¶23} On re-direct examination, the Victim was asked about an incident which occurred at a hotel. The Victim recalled Appellant returned home "a little drunk." Appellant told the Victim they were going to get something to eat. Jones was recovering from surgery at the time. Appellant proceeded to a hotel, telling the Victim she could swim for a little bit. The Victim waited in the car while Appellant went into the hotel to pay for the room. The pool was closed due to the pandemic. Appellant took the Victim to the room where he proceeded to touch her breasts and vagina. The Victim noted Jones was concerned when they finally arrived home because they had been gone so long.

{¶24} N.W. testified she has known the Victim since the two were in elementary school. N.W. detailed an incident involving Appellant which occurred while she and the Victim were "hanging out" in the Victim's room. She recalled Appellant entered the room and pushed the Victim onto her bed. Appellant removed the Victim's pants. N.W. observed Appellant touch the Victim's vagina. Appellant then asked N.W. if he could touch her. N.W. explained Appellant wanted to touch "[m]y private area." *Id*. at 251. Feeling scared, N.W. ran out of the room and looked for Jones. N.W. was unable to locate Jones and returned to the Victim's room. The Victim pulled her pants back on and Appellant left the room. N.W. and the Victim did not discuss the incident for the rest of the day.

{¶25} Two days later, N.W. approached the Victim and spoke about what occurred. N.W. asked the Victim if she could tell someone or if N.W. could tell someone. The Victim said, "No." N.W. told the Victim what Appellant did was wrong. N.W.

indicated the Victim thought it was just something which normally happens. The Victim asked N.W. not to tell anyone. Sometime thereafter, N.W. and the Victim were at a sleepover with two other girls when the Victim disclosed Appellant's abuse. The Victim also told the other girls not to tell anyone. On cross-examination, N.W. noted the incident in the Victim's room occurred in February, 2019, and the Victim's disclosure at the sleepover occurred in October, 2019. N.W. explained she never told anyone because the Victim had asked her not to do so.

(ECF No. 12-1, Exhibit 9); *State v. Hodkinson*, No. 2022 AP 01 0001, 2022 WL 16645713, 2022-Ohio-3931 (5th Dist. Nov. 2, 2022).

## III.  PROCEDURAL HISTORY

### A.  <u>State Court Conviction</u>

On July 2, 2021, Mr. Hodkinson was indicted in the Tuscarawas County Court of Common Pleas on: (1) seven first-degree felony counts of rape in violation of O.R.C. §§ 2907.02(A)(1)(b) and 2907.02(B); (2) one first-degree felony count of rape in violation of O.R.C. §§ 2907.02(A)(2) and 2907.02(B); (3) seven third-degree felony counts of gross sexual imposition in violation of O.R.C. §§ 2907.05(A)(4) and 2907.05(C)(2); and (4) one fourth-degree felony count of gross sexual imposition in violation of O.R.C. §§ 2907.05(A)(1) and 2907.05(C)(1). (ECF No. 12-1, Exhibit 1). The rape charges also carried sexually violent predator specifications, as did each of the third-degree felony gross sexual imposition counts. *Id*. On July 21, 2021, Mr. Hodkinson pled not guilty to the charges. (ECF No. 12-1, Exhibit 2).

The case proceeded to trial. After the prosecution closed its case-in-chief, Mr. Hodkinson's counsel informed the court that he believed the testimony of the victim ("A.M.") and N.W. contradicted in certain respects statements they had made during their forensic interviews with the child advocacy center. (ECF No. 12-3, PageID # 511). Defense counsel also informed the court that he was not prepared to impeach A.M. and N.W. with their prior inconsistent statements while they were on the stand because he had not realized that they

were going to testify differently than they had in their interviews. *Id.* at PageID # 512. Defense counsel further informed the court that he did not have copies of the video recordings of the interviews with which to impeach the witnesses. *Id.* at PageID # 511. Defense counsel informed the court that he wanted to play the videos for the jury in light of the alleged inconsistencies. *Id.*

In accordance with the request of Mr. Hodkinson's counsel, the video interviews of A.M. and N.W. were played, in their entirety, for the jury at the beginning of Mr. Hodkinson's defense. *Id.* at PageID # 514-15. Mr. Hodkinson's counsel did not provide the jury with any context for the videos before the jury viewed them. However, counsel did attempt to point to alleged inconsistencies in the testimony of A.M. and N.W. during closing arguments. (ECF No. 10-4, PageID # 559-61).

On December 2, 2021, the jury found Mr. Hodkinson guilty on all counts. (ECF No. 12-1, Exhibit 3). On December 9, 2021, the trial court sentenced Mr. Hodkinson to an aggregate term of life in prison without the possibility of parole. (ECF No. 12-1, Exhibit 4).

### B.  Direct Appeal

On January 3, 2022, Mr. Hodkinson, through new counsel, timely filed a notice of appeal to the Fifth Appellate District. (ECF No. 12-1, Exhibit 5). On April 12, 2022, Mr. Hodkinson filed his appellate brief, raising the following assignments of error:

1.  Appellant was deprived of the effective assistance of counsel where trial counsel failed to adequately prepare for trial and failed to adequately cross examine witnesses in violation of the Sixth and Fourteenth Amendments.

2.  Appellant's convictions for rape was [*sic*] not supported by sufficient evidence.

(ECF No. 12-1, Exhibit 6).

In his first ground for relief, Mr. Hodkinson argued, in relevant part, that his trial counsel was ineffective because counsel (1) was not prepared to impeach A.M. and N.W.;

7

and (2) decided to address alleged inconsistencies between their testimony and their prior interviews with the child advocacy center by playing videos of the interviews for the jury in their entirety, which served only to bolster their credibility.[1]

On November 2, 2022, the Fifth Appellate District affirmed Mr. Hodkinson's convictions. (ECF No. 12-1, Exhibit 9). On December 19, 2022, Mr. Hodkinson, through counsel, timely filed a notice of appeal to the Ohio Supreme Court. (ECF No. 12-1, Exhibit 10). In his memorandum in support of jurisdiction, Mr. Hodkinson raised the following proposition of law:

> 1. Appellant was deprived of the effective assistance of counsel where trial counsel failed to adequately prepare for trial and failed to adequately cross examine witnesses in violation of the sixth and fourteenth amendments.

(ECF No. 12-1, Exhibit 11). On February 28, 2023, the Ohio Supreme Court declined to accept jurisdiction over the appeal. (ECF No. 12-1, Exhibit 12).

### C.  Federal Habeas Action

On April 1, 2024, Mr. Hodkinson, acting *pro se*, filed his 28 U.S.C. § 2254 habeas petition. (ECF No. 1). Mr. Hodkinson's habeas petition raises a single ground for relief:

> 1. The state court's adjudication of petitioner's claim that he was deprived of the effective assistance of counsel based on counsel's failure to adequately prepare for trial and failed to adequately cross examine witnesses, in violation of the Sixth and Fourteenth Amendments, resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

*Id*. The Warden filed an answer/return of writ on October 15, 2024. (ECF No. 12).

Mr. Hodkinson filed his traverse on December 16, 2024. (ECF No. 14).

---

[1] Mr. Hodkinson also argued that his trial counsel was ineffective in failing to object to A.M.'s testimony that Mr. Hodkinson refused to let her keep a dog when she and her mother moved out of the house. Mr. Hodkinson does not raise that argument in this proceeding.

On March 11, 2025, I entered an order requiring the Warden to file the video recordings of the interviews that A.M. and N.W. gave to the child advocacy center, or, alternatively, to file a transcript of those interviews. (*See* ECF non-document entry dated March 11, 2025). On March 20, 2025, the Warden filed the video recordings of both interviews. (ECF No. 15).

## IV. STANDARDS OF REVIEW AND GOVERNING LAW

### A.  <u>Jurisdiction</u>

28 U.S.C. § 2254(a) authorizes this court to entertain an application for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A state prisoner may file a § 2254 petition in the "district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him[.]" 28 U.S.C. § 2241(d). The Tuscarawas County Court of Common Pleas sentenced Mr. Hodkinson, and the Court takes judicial notice that Tuscarawas County is within this Court's geographic jurisdiction. Accordingly, this Court has jurisdiction over Mr. Hodkinson's § 2254 petition.

### B.  <u>Cognizable Federal Claim</u>

Under 28 U.S.C. § 2254(a), a state prisoner may challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A petitioner's claim is not cognizable on habeas review if it "presents no federal issue at all." *Glaze v. Morgan,* No. 1:19-CV-02974, 2022 WL 467980, at *4 (N.D. Ohio Jan. 18, 2022) (quoting *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991)). Thus, "errors in application of state law . . . are usually not cognizable in federal habeas corpus." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citing *Walker v. Engle*, 703 F.2d 959, 962 (6th

Cir. 1983)); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.").

A federal habeas court does not function as an additional state appellate court; it does not review state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987)). Instead, "federal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Id.* (quotation omitted).

### C. **AEDPA Standard of Review**

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(*Id.*)

To determine whether relief should be granted, the Court must use the "look-through" methodology and look to the "last explained state-court judgment" on the petitioner's federal claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them no effect—which simply 'looks through' them to the last reasoned decision—most nearly reflects the role they are ordinarily intended to play."); *Wilson v. Sellers*, 138 S. Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations and citations omitted). "[U]nder the unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"—it must be "objectively unreasonable." *Id.*

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(d)(2)). A state court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the trial court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). A state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice v. Collins*, 546 U.S. 333, 341-

11

42 (2006). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18 (citing 28 U.S.C. § 2254(e)(1)).

For state prisoners, the § 2254(d) standard "is difficult to meet . . . because it is meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This is because, "[a]s amended by AEDPA, § 2254(d) is meant only to stop short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id.* at 103. "It preserves authority to issue the writ in cases where there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents" and "goes no further." *Id.* Thus, in order to obtain federal habeas corpus relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

## V.  ANALYSIS

In his sole ground for relief, Mr. Hodkinson argues that he received ineffective assistance of trial counsel under the Sixth and Fourteenth Amendments. A petitioner claiming ineffective assistance of counsel must show that: (1) counsel's representation "fell below an objective standard of reasonableness," such that he was not performing as counsel guaranteed under the Sixth Amendment; and (2) counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Under the first prong, the petitioner must overcome the "strong[] presum[ption that counsel] rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. For prejudice, the petitioner must show that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The *Strickland* standard is "extremely deferential.'" *Kelly v. Lazaroff*, 846 F.3d 819, 829 (6th Cir. 2017) (quoting *Strickland*, 466 U.S. at 690). "[T]he goal is not to ensure that a criminal defendant be afforded perfect counsel, but rather 'to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Id.* (quoting *Strickland*, 466 U.S. at 687).

Mr. Hodkinson argues that his trial counsel was ineffective because counsel (1) was not prepared to impeach A.M. or N.W. with prior inconsistent statements they made during their interviews with the child advocacy center; and (2) attempted to rectify his inability to impeach A.M. or N.W. while they were on the stand by playing the full video recordings of their interviews for the jury, which, Mr. Hodkinson argues, merely bolstered their credibility and elicited additional damaging facts.[2] I conclude that Mr. Hodkinson has satisfied the first prong of *Strickland* because the performance of his trial counsel fell below an objective standard of reasonableness. However, I also conclude that Mr. Hodkinson has failed to establish that he was prejudiced by his counsel's deficient performance.

### A. Deficient Performance

Before considering the merits of Mr. Hodkinson's argument that his counsel's performance was deficient, I must determine the level of deference owed to the Fifth Appellate District, the last state court to issue a reasoned decision on the issue. *See Ylst*, 501 U.S. at 804. As a general matter, where the state court reaches the merits of an ineffective assistance of counsel claim, federal habeas courts provide AEDPA deference to that adjudication under § 2254(d). *See Perkins v. McKee,* 411 F. App'x 822, 828 (6th Cir. 2011). The Sixth Circuit has emphasized the double layer of deference that federal courts must give

---

[2] The Warden does not argue either that Mr. Hodkinson has failed to exhaust his claim or that he has procedurally defaulted on it.

13

state courts in reviewing federal ineffective assistance of counsel claims under AEDPA:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. … An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. … Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

> *Id*. (quoting *Harrington,* 131 S.Ct. 770, 786-88).

The deference inquiry is different here, however, as the Fifth Appellate District did not analyze the deficient performance prong on the merits, and instead proceeded directly to considering whether Mr. Hodkinson suffered prejudice from his counsel's alleged ineffectiveness. (ECF No. 12-1, Exhibit 9, ¶ 32) ("Assuming, arguendo, trial counsel was ineffective for failing to impeach the victim's testimony with prior inconsistent statements . . . we find Appellant failed to establish, 'but for counsel's error, the result of the proceedings would have been different.") (quoting *Strickland*, 466 U.S. at 695). Because the Fifth Appellate District did not address the deficient performance prong on the merits, its decision is not entitled to AEDPA deference on the deficient performance issue. *See Moss v. Olson*, 699 F. App'x 477, 481-82 (6th Cir. 2017) ("Because the state court in the present case based its ruling on the prejudice prong without reaching the deficient performance prong, this Court reviews the deficient performance prong de novo, but still affords the prejudice prong AEDPA deference."). I will therefore analyze *de novo* whether counsel's performance fell below an objective standard of reasonableness.

As noted above, Mr. Hodkinson argues that his trial counsel was ineffective both

because counsel failed to impeach A.M. and N.W. with their prior inconsistent statements and because counsel instead attempted to highlight alleged inconsistencies in their testimony by playing in full the video recordings of their interviews with the child advocacy center. As a general rule, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). However, a court "do[es] not consider counsel's actions objectively reasonable when they could not possibly 'be considered sound trial strategy.'" *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013) (quoting *Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005)). Notably, "[i]mpeachment strategy falls within this category of trial tactics." *Tackett v. Trierweiler*, 956 F.3d 358, 374 (6th Cir. 2020).

Here, based on counsel's own statements during trial, Mr. Hodkinson is correct that his trial counsel was unprepared to impeach A.M. or N.W. during cross-examination. After A.M. and N.W. testified, Mr. Hodkinson's counsel informed the court that he "didn't realize their story was not going to really match up with what they said" during their prior interviews

with the child advocacy center. (ECF No. 12-3, PageID # 512). Counsel also informed the court that he "didn't have" the video recordings of those interviews, which meant he could not impeach either witness with them while the witnesses were on the stand. *Id*. at PageID # 511. Counsel did not say what efforts, if any, he took to obtain copies of the interviews prior to trial. However, when the issue was raised, counsel for the State immediately stated that he was "happy to give them to you." *Id*.

It thus appears that counsel's failure to impeach A.M. and N.W. on the stand was not a premeditated decision, but rather the result of counsel's inadequate preparation. Under the circumstances I am skeptical that counsel's failure to impeach could be considered "sound trial strategy" for purposes of *Strickland*. *See Lafler*, 734 F.3d at 512; *White v. McAninch*, 235 F.3d 988, 996-97 (6th Cir. 2012) (holding that trial counsel's strategy was not reasonable where counsel "seems to have formulated [it] . . . in the few minutes between reviewing the tape and beginning cross examination" and that trial counsel's "deficient pretrial preparation renders the strategy highly suspect").

It is true that "[t]he failure of trial counsel to attempt to impeach [a witness] with minor inconsistencies, immaterial discrepancies, or details omitted from the initial statement to police" does not generally fall outside "the wide range of reasonable professional assistance." *Peterson v. Smith*, 510 F. App'x 356, 362 (6th Cir. 2013). The alleged inconsistencies here do not appear to be critical to the case. During closing arguments, for example, counsel noted that A.M. testified that sex with the defendant did not hurt and that she did not bleed, but that in her video interview, she testified that it did hurt. (ECF No. 12-4, PageID # 559). Trial counsel also noted that A.M.'s trial testimony and her statements to the child advocacy center differed regarding whether Mr. Hodkinson actually attempted to

16

grope N.W. or whether he only asked to touch her. *Id*. at PageID # 560. Counsel further argued that discrepancies existed in A.M.'s story regarding the incident where Mr. Hodkinson abused A.M. at a hotel. Counsel told the jury that A.M. "didn't have a lot to say about it when she testified." (ECF No. 12-4, PageID # 561). However, in the video interview, A.M. testified that she attempted to fight Mr. Hodkinson off and that she went to the bathroom to wipe herself off after Mr. Hodkinson finished sexually abusing her. *Id*.

This is not powerful impeachment evidence. Had Mr. Hodkinson's counsel merely failed to impeach A.M. and N.W. with their prior, allegedly-inconsistent statements on those issues, I would likely conclude that trial counsel's performance did not fall below an objective standard of reasonableness. *See Moss*, 699 F. App'x at 487 ("Though counsel could have further probed the inconsistencies highlighted by the district court, his failure to do so in light of the otherwise extensive cross-examination does not undermine the presumption that his 'conduct falls within the wide range of reasonable professional assistance.'") (quoting *Strickland*, 466 U.S. at 689).

However, counsel did not end matters here by failing to impeach A.M. and N.W. on cross-examination. Instead, he made what was, by his own admission, an "unusual request" to play the video interviews of A.M. and N.W. in full for the jury. (ECF No. 12-3, PageID # 511). Counsel candidly admitted that he "didn't think about doing until today," but told the court that the video interviews "just . . . don't match up entirely so I think the jury should view those." *Id*. at PageID # 511. Both videos were then played for the jury in full, without any explanation as to why Mr. Hodkinson's counsel was introducing them and without any effort to place them in context for the jury before they were played. Notably, by the time that Mr. Hodkinson's counsel played the video interviews for the jury, the State had already rested

its case without seeking to introduce the video interviews into evidence. The prosecutor later stated that she had "really never had a Defendant admit my exhibit . . .and so I don't even know how that works honestly." (ECF No. 12-4, PageID # 545).

Mr. Hodkinson is also correct that the likely impact of the video interviews would have been to bolster the credibility of A.M. and N.W. During her interview, A.M. corroborated much of her original testimony and expanded on some of it, telling the investigator that Mr. Hodkinson began sexually abusing her when she was six years old; that he touched her breasts and vagina; that he put her penis inside of her; that he ejaculated inside of her and on her; that one incident occurred at a hotel; that he attempted to sexually abuse N.W. as well; and that the abuse recently stopped because Mr. Hodkinson was having problems with his back. N.W.'s interview also largely corroborated her trial testimony, as she told the investigator that Mr. Hodkinson sexually abused A.M. while N.W. was in the room and that Mr. Hodkinson attempted to touch her as well.

Even assuming that counsel's actions could be said to be part of a considered strategy to undermine the credibility of A.M. and N.W., his performance was unreasonable. "The mere fact that defense counsel [acted] with a strategy in mind . . . does not end the analysis." *Manley v. Ross Corr. Inst.*, 314 F. App'x 776, 783 (6th Cir. 2008). Instead, a court "'must also assess if this strategy was itself constitutionally deficient.'" *Id*. (quoting *Washington v. Hofbauer*, 228 F.3d 689, 704 (6th Cir. 2000)). "As [the Sixth Circuit] has previously recognized, 'the label "strategy" is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel.'" *Id*. (quoting *Lovett v. Foltz*, 884 F.2d 579, 1989 WL 101522, at *4 (6th Cir. 1989) (per curiam) (unpub.)). Thus, "'[e]ven deliberate trial tactics may constitute ineffective assistance of counsel if they fall outside the wide range of

professionally competent assistance.'" *Id*. at 783-84 (quoting *Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984)).

The actions of Mr. Hodkinson's counsel fell outside the wide range of professional competence here. The Warden accuses Mr. Hodkinson of complaining that his trial counsel "allowed too much truth into the record." (ECF No. 12, PageID # 67). As Mr. Hodkinson correctly responds, however, his actual complaint is that his trial counsel affirmatively *introduced* unfavorable evidence into the record, and trial counsel did so in a way that deprived the jury of any context surrounding the video interviews. Courts in this circuit have not hesitated to find that a petitioner satisfies the first *Strickland* prong where trial counsel affirmatively elicits information that is damaging to the defense or that corroborates the testimony of a key witness. *See Manley*, 314 F. App'x at 783 ("We are of the view that defense counsel's decision to call Guidera as a witness constituted deficient performance under *Strickland* because it bolstered the testimony provided by witnesses for the prosecution and related to the jury additional testimony corroborating the prosecution's version of the facts."); *McAninch*, 235 F.3d at 997 (holding that counsel's performance fell below an objective standard of reasonableness where counsel "affirmatively elicit[ed]" testimony regarding an uncharged act of sexual intercourse between the defendant and the victim); *Hartman v. Ohio Adult Parole Auth.*, No. 3:19-cv-003, 2023 WL 2746209, at *24 (S.D. Ohio Mar. 31, 2023) (holding that trial counsel's performance was deficient under *Strickland* where cross examination "did not attempt to impeach [witness] with any inconsistent statements but, rather, bolstered her credibility and supported the State's case by supplying several examples of 'force' used by Petitioner").

In a trial that where the credibility of the victim and an alleged eyewitness would be

key issues, reasonably competent counsel would have considered the possibility that the testimony of those witnesses might differ from prior statements they had given to an investigator. Reasonably competent counsel also would have sought to obtain the means to impeach the witnesses with those prior statements before trial. Having failed to impeach A.M. or N.W. on the stand, reasonably competent counsel would not have exacerbated the issue by introducing the *entirety* of their prior video interviews for the jury, thereby bolstering the credibility of both witnesses without explaining to the jury why they were watching the interviews. I therefore recommend the Court hold that the performance of Mr. Hodkinson's counsel was objectively unreasonable and that Mr. Hodkinson has satisfied the first prong of *Strickland*.

### B. **Prejudice**

My conclusion that Mr. Hodkinson has satisfied the first *Strickland* prong does not end the inquiry, as Mr. Hodkinson must also show prejudice, meaning a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. In conducting that inquiry, a court must "consider the cumulative effect of [counsel]'s deficient performance." *Hewitt-El v. Burgess*, 53 F.4th 969, 981 (6th Cir. 2022).

The Fifth Appellate District addressed the prejudice element on the merits, holding that Mr. Hodkinson failed to establish a reasonable probability that the result of the trial would have been different absent his counsel's alleged errors. (ECF No. 12-1, Exhibit 9, ¶ 32). As discussed above, a double layer of deference applies under AEDPA to a state court's adjudication of an ineffective assistance claim on the merits. *See Perkins,* 411 F. App'x at 828. Applying that double layer of deference, I cannot say that the Fifth Appellate District

erred in holding that Mr. Hodkinson failed to show prejudice.

As an initial matter, while the State did not introduce any forensic evidence, A.M. provided detailed trial testimony regarding Mr. Hodkinson's sexual abuse. In addition, the State presented testimony from N.W., an eyewitness who testified that she directly observed Mr. Hodkinson sexually abuse A.M. and that Mr. Hodkinson attempted to abuse N.W. as well. The State also presented evidence linking Mr. Hodkinson to the hotel room in which A.M. testified that Mr. Hodkinson abused her on one occasion.

Moreover, while I have concluded that counsel was ineffective in playing the videos for the jury, Mr. Hodkinson overstates the extent to which they contained new information that materially altered the evidence against him. Mr. Hodkinson argues in his traverse that the videos "provided the jury with a level of detail that was missing from A.M.'s testimony . . . ." (ECF No. 14, PageID # 612). In his brief to the Fifth Appellate District, he argued in particular that the video interview provided the following additional details: (1) that Mr. Hodkinson ejaculated inside of her on a couple of occasions; (2) that the frequency of the abuse decreased as Mr. Hodkinson developed back problems; and (3) the type and color of the towels that Mr. Hodkinson handed her to clean herself up after he finished abusing her. (ECF No. 12-1, Exhibit 6, PageID # 121).

But A.M. testified to numerous details of the abuse at trial, including that Mr. Hodkinson began sexually abusing her when she was six or seven years old; that he touched her breasts and her vagina; that he penetrated her and ejaculated on her; that, as Mr. Hodkinson got older, he began getting weaker and had trouble getting an erection; and that Mr. Hodkinson would give her a towel to clean herself up after he finished abusing her. (ECF No. 12-3, PageID # 465-78). Thus, while A.M. may have provided additional detail about

21

certain aspects of the abuse in her video interview, she had already testified extensively about those same subjects when she was on the stand.

Accordingly, the Fifth Appellate District reasonably concluded that there was not a reasonable likelihood of a different result if Mr. Hodkinson's counsel had properly impeached A.M. and N.W. and had refrained from playing the full video of their interviews with the child advocacy center for the jury. *See Manley*, 314 F. App'x at 786 (holding that, notwithstanding counsel's deficient performance in calling witness who provided damaging testimony, defendant did not suffer prejudice in light of overall evidence of guilt); *Moss*, 699 F. App'x at 487 ("Given the depth of the cross-examination and counsel's repeated reference to inconsistencies in M's story, the state court's ruling that additional questions regarding M's inconsistences were unlikely to have impacted the outcome was not 'so lacking in justification that there was an error well understood and comprehended in existing law beyond the possibility for fairminded disagreement.'") (quoting *Harrington*, 562 U.S. at 103); *Cruz v. Roggenbuck*, No. 11-15502, 2014 WL 764850, at *8 (E.D. Mich. Feb. 26, 2014) (holding that, despite trial counsel "eliciting specific and damaging testimony about Petitioner's sexual activity with an underage girl," petitioner did not satisfy prejudice prong of *Strickland* because "[t]he victim was very specific about the sexual activity that she and Petitioner had engaged in"). I therefore recommend that the Court deny Mr. Hodkinson's sole ground for relief on the merits because he has not satisfied the prejudice prong of *Strickland*.

# VI. RECOMMENDATION REGARDING CERTIFICATE OF APPEALABILITY

## A. <u>Legal Standard</u>

As amended by AEDPA, 28 U.S.C. § 2253(c)(1) provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. The statute further provides that "[a] certificate of appealability may issue .

. . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "[a] 'substantial showing' requires the applicant to 'demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996)). The statute requires that certificates of appealability specify which issues are appealable. 28 U.S.C. § 2253(c)(3).

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. "If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." *Id.*; *see also* 28 U.S.C. § 2253(c)(3) ("The certificate of appealability under [§ 2253(c)(1)] shall indicate which specific issue or issues satisfy the showing required by [§ 2253(c)(2)]."). In light of the Rule 11 requirement that the court either grant or deny the certificate of appealability at the time of its final adverse order, a recommendation regarding the certificate of appealability issue is included here.

## B. <u>Analysis</u>

Mr. Hodkinson has not made a substantial showing of a denial of a constitutional right for the reasons set forth above. Because jurists of reason would not find these conclusions

debatable, I recommend that no certificate of appealability issue in this case.

## VII. RECOMMENDATION

For the foregoing reasons, I RECOMMEND that the Court DENY Mr. Hodkinson's

petition for a writ of habeas corpus under 28 U.S.C. § 2254. I also recommend that the Court

not grant him a certificate of appealability.

Dated:  April 18, 2025

*/s/ Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

### NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or

waiver of the right to raise the issue on appeal either to the district judge or in a subsequent

appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).